**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CONPROCA, S.A. DE C.V.

              Petitioner

v.

PETRÓLEOS MEXICANOS AND
PEMEX-REFINACIÓN

              Respondents

No. 11-Civ-9165 (LLS)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

Thomas C. Goldstein
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave. NW
Suite 404
Washington, DC 20015
Tel.: 202.362.0636
tgoldstein@goldsteinrussell.com

Attorneys for Respondents

Conproca, S.A. de C.V. ("Conproca"), has filed a First Amended Petition to Confirm Arbitration Award. Respondents Petróleos Mexicanos and Pemex Refinación (collectively "Pemex"), have moved to dismiss the petition for lack of personal jurisdiction (including defective service of processs), for lack of venue, and on grounds of *forum non conveniens*.[1] For the foregoing reasons, this Court should grant the motion.

## BACKGROUND AND PROCEDURAL POSTURE

Pemex and Conproca are both organized under the laws of Mexico. Petróleos Mexicanos is an instrumentality of the Mexican government, charged with developing the nation's oil and gas resources, and Pemex Refinación is a subsidiary of Petróleos Mexicanos responsible for refining operations. Petróleos Mexicanos has other subsidiaries as well, including Pemex Exploración y Producción, Pemex Gas y Petroquímica Básica, and Pemex Petroquímica, which deal with other aspects of the Mexican oil and gas industry, and are not involved in this case. Conproca is a special purpose vehicle created for the purpose of executing and performing an agreement with Pemex. Pemex believes that Conproca is jointly owned by the South Korean company SK Engineering & Construction Co., Ltd., and by the German company Siemans AG.

Pemex and Conproca executed a series of contracts, including a Financed Public Works Contract and a Unit Price Public Works Contract, both dated November 26, 1997. Under these agreements, Pemex engaged Conproca to assist with the expansion and modernization of one of Pemex's refineries, located in the Cadereyta de Jimenez municipality in Mexico, and to perform related works. The contracts were drafted in Spanish, executed in Mexico, and governed by Mexican law. All performance was to be completed in Mexico.

---

[1] The parties have agreed to separately brief issues related to the merits of Conproca's request to confirm the arbitral award.

After disputes regarding performance of the contracts arose, the parties submitted the matter to arbitration—again, in Mexico, in Spanish, and governed by Mexican arbitral law. The arbitral tribunal bifurcated the proceedings and issued two awards: one relating to liability, which was issued on December 17, 2008, *see* Declaration of David Hille Exh. 5, and one relating to the quantum of damages, issued December 23, 2011 and finalized on April 19, 2012, *see* Second Supplemental Declaration of David Hille Exh. 1 ("Quantum Award Translation"); Third Supplemental Declaration of David Hille Exh. 1 (April 19 Addendum to Award).

The quantum award, which is the more important of the two awards because it is the only one that purports to settle the parties' dispute, was not unanimous. It also includes a sharp dissent from the only Mexican arbitrator on the panel, arbitrator Alejandro Ogarrio Ramírez, who argued that the panel failed to properly understand or apply Mexican law—specifically, that it refused to properly allocate the burden of proof to Conproca, in violation of both Mexican procedural law and the underlying contracts incorporating Mexican law into the arbitration clause. *See* Quantum Award Translation 405 n.486 (summarizing the basis for arbitrator Ogarrio's dissent, which was also articulated in footnotes throughout the award). Arbitrator Ogarrio also raised numerous other errors committed by the panel.

Pemex intends to initiate proceedings to set aside the award in the primary jurisdiction— Mexico—as soon as practicable, but Conproca has not sought confirmation of the award there. Instead, Conproca asks this Court to confirm the award in the first instance. It filed a petition to confirm the quantum award in this Court on January 13, 2012. On April 11, 2012, Conproca filed affidavits of service stating that it had sent, "by UPS mail," the summons, petition, and supporting materials to several of Pemex's addresses. *See* DE 8-12. Later, after the parties had

agreed on the briefing schedule in this case, Pemex received documents in connection with an attempt to serve Pemex by letter rogatory.

## ARGUMENT

This Court should dismiss Conproca's petition for three reasons.

First, the Court lacks personal jurisdiction—both statutory and constitutional—over Pemex. Conproca "bears the burden of demonstrating personal jurisdiction over" Pemex. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). To hear Conproca's claim, this Court "must have a statutory basis for asserting jurisdiction over a defendant, and the Due Process Clause typically also demands that the defendant, if not present within the territory of the forum, . . . have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 396 (2d Cir. 2009) (internal quotation marks and citations omitted).

Because Pemex is an instrumentality of a foreign government, the Foreign Sovereign Immunities Act (FSIA) governs the statutory component of personal jurisdiction. Under the FSIA, personal jurisdiction exists only if the court has subject-matter jurisdiction over the action, and service has been made in accord with the requirements of the FSIA. *See* 28 U.S.C. § 1330(b). The FSIA provides that absent a special arrangement for the service of process, parties must serve each other in compliance with applicable international conventions. *Id*. § 1608(b). Service by mail or courier does not satisfy those requirements, and so the methods of service proven to the Court thus far are invalid.

The Court also lacks jurisdiction over Pemex as a constitutional matter. Due process requires that before a court shall entertain any action, including an action to confirm an arbitral award, the defendant must have minimum contacts with the jurisdiction, and the exercise of

3

jurisdiction must be reasonable. Conproca cannot satisfy its burden to meet this standard, and so the petition must be dismissed for that reason as well.

Second, the petition should be dismissed on *forum non conveniens* grounds. Mexico is not only an adequate alternate forum—it is a far superior forum to resolve the issues in this case. The only connection between this case and this forum is Conproca's decision to seek confirmation here. But all of the key facts relate to Mexico—the parties are Mexican, the contract was executed there and is governed by Mexican law, and the arbitration was also conducted in Mexico under Mexican law. Conproca's forum preference is entitled to little, if any weight against the significant public and private interests weighing in favor of resolving the validity of the award in Mexico.

Finally, venue in the Southern District of New York is inappropriate. The FSIA's venue provisions state that when the defendant is an agency or instrumentality of a foreign state, venue lies "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," or "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." 28 U.S.C. § 1391(f)(1), (3). None of the events that gave rise to this action occurred in New York, Conproca has not identified any relevant property in New York, and Pemex does not do business in New York, so venue does not lie here.[2]

---

[2] Pemex acknowledges that in 2010, Judge Hellerstein, hearing a case regarding a different petition for confirmation of an arbitral award, ruled adversely to it on both the question of personal jurisdiction and the question of *forum non conveniens*. *See* Transcript of Proceedings on August 25, 2010, *Corporación Mexicana de Mantenimiento Integral v. PEMEX-Exploración y Producción*, No. 10-cv-206 (AKH), ECF No. 48. PEMEX disagrees with the reasoning and result of that ruling.

I.     **This Court Lacks Statutory Personal Jurisdiction Because Conproca Has Not Validly Served Pemex.**

The FSIA applies whenever a party sues a foreign state or an agency or instrumentality of a foreign state. In addition to immunity doctrines, the FSIA establishes unique procedures applicable to actions against foreign states and their instrumentalities. The statute's personal jurisdiction provision provides that personal jurisdiction exists if two requirements are met: the court has subject matter jurisdiction, and service was accomplished in accord with the FSIA's service provisions. *See* 28 U.S.C. § 1330(b).

Conproca has not served Pemex in accord with the FSIA. The FSIA provides that service upon instrumentalities of foreign governments may be accomplished:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents . . . .

28 U.S.C. § 1608(b). There is no "special arrangement" between the parties, and therefore service must be accomplished in accordance with Section 1608(b)(2). In this case, that means that Conproca must perfect service in compliance with either the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention") or the Inter-American Convention on Letters Rogatory and its Additional Protocol. Pemex believes that Conproca has begun that process, but its prior service was defective and cannot support this action.

**A.  The Parties Have Not Agreed Upon Any Special Arrangement for Service.**

The parties do not have a "special arrangement for service" that would permit Conproca to circumvent the applicable treaty regimes. A special arrangement for service exists only when a contract spells it out. While a contract need not provide for service of process in so many words, it must use unambiguous language that clearly encompasses such service. For example, in *Arbitration Between Space Systems/Loral, Inc. v. Yuzhnoye Design Office*, 164 F.Supp.2d 397, 402 (SDNY 2001), this Court found a special arrangement in contractual language providing that "[a]ll notices and communications between the [p]arties shall be in writing and shall be effective, if delivered in person to the authorized representative of the recipient party at the address listed below, or sent by express mail or Data fax." *See also G.E. Transp. S.P.A. v. Republic of Albania*, 693 F.Supp.2d 132, 136-37 (D.D.C. 2010) (finding a special arrangement in a contract providing that "[a]ny notice to be given to [Albania] ... shall be in writing, and shall be sent by personal delivery, air post, special courier, cable, telegraph, telex or facsimile transmission to or left at [Albania's] address."); *Int'l Road Fed. v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp.2d 248, 251 (D.D.C. 2001) (special arrangement found when the contract provided that "[a]ll notices, demands, or requests between Sublessor and Sublessee shall be delivered in person, by certified mail, return receipt requested, or by registered mail . . .").

On the other hand, when contractual language is less comprehensive, courts cannot expand it to create a special arrangement. The case on point is *Berdakin v. Consulado de la Republica de El Salvador*, 912 F. Supp. 458, 466 (C.D. Cal. 1995), in which a lease provided that "[w]henever under this Lease a provision is made for any demand, notice or declaration of any kind, it shall be in writing and served either personally or sent by registered or certified United States mail, postage prepaid," to the tenant. The court reasoned that "[b]y its terms, the recital applies to demands, notices, and declarations provided for by the lease. The lease provides

6

for many such notices . . . . Since the lease does not mention service of process and contains many much more plausible referents for recital 22's notice provisions, the Court finds that recital 22 does not constitute a special arrangement for service of process." *Id*. In *Loral*, this Court cited *Berdakin* with approval, and distinguished that case from others involving comprehensive notice clauses. *See* 164 F.Supp.2d at 402. Similarly, in *Copelco Capital, Inc. v. Gen. Consul of Bolivia*, 940 F. Supp. 93, 95 (S.D.N.Y. 1996), the contract provided for jurisdiction in the courts of New Jersey, and stated that "service of process by certified mail, return receipt requested, shall be deemed the equivalent of personal service in any such action." This Court held that there was no special arrangement for service of process in federal actions because the service clause was coterminous with the jurisdiction clause, which referred only to state court actions. *Id*. And in *Underwood v. United Republic of Tanzania*, 1995 WL 46383, at *2 (D.D.C. 1995) (unpublished disposition), the court held that a contract providing that "notices 'required or permitted herein' would be effective when mailed or hand-delivered to the property or the Embassy" did not create a special arrangement because the contract never mentioned service of process, and service was therefore not "required or permitted" by the contract.

In Conproca's affidavits of service, filed with this Court on April 11, 2012, the affiant states that service was attempted "by UPS mail" in accordance with Clause 39 of the Financed Public Works Contract. *See* Docket Entries 8-12. However, Clause 39 never mentions service of process, nor does it contain sweeping language that encompasses service of process. Instead, it provides that "[a]ll notices and other communications *to be issued pursuant to this Contract* will be in writing and will produce effects when received by the addressee at (i) the address or fax indicated below." Hill Decl. Exh. 1, ¶ 39. Like the contract in *Berdakin*, the Financed Public

Works Contract contains myriad notice requirements—at least 25 of them.[3] Conspicuously, however, the contract never mentions service of process. Indeed, it would make no sense for the contract to provide for such service since the contract contemplates arbitration, not litigation. Thus, it cannot be said that service of process is a "notice[] or other communication[] . . . issued pursuant to this Contract." The same is true of the Unit Price Public Works Contract.

Because no relevant contract sets forth a special arrangement for the service of process, 28 U.S.C. § 1608(b)(1) does not apply in this case. Consequently, Conproca must serve Pemex pursuant to 28 U.S.C. § 1608(b)(2).

## B. Conproca's Service by UPS Does Not Comply with the FSIA.

In the absence of a special arrangement, the FSIA provides that service may be accomplished either through a designated U.S. agent for service, or "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(b)(2). Pemex does not have a designated U.S. agent, and so service must be accomplished under the relevant international conventions. Mexico and the United States are parties to two relevant

---

[3] Some examples are: notice of the owner's objections to the contractor's choice of subcontractors, Hill Decl. Exh. 1, ¶ 7.1, notices relating to extensions of time to perform critical obligations, id. ¶ 9.3, notice that the proposed general layout had been rejected, *id*. ¶ 11.1, notice of a variation from the contractual schedule of approved equipment providers, *id*. ¶ 12.5, notice of a failed inspection of materials or work, *id*. ¶ 13.1, notice of the owner's intent to enter manufacturing facilities for inspection purposes, *id*. ¶ 13.2, notice before works are covered and placed out of sight, *id*. ¶ 13.7, notice regarding errors in the placement of the works, *id*. ¶ 14.2, notice of performance tests, *id*. ¶ 15.4, notice of required repairs and replacement, *id*. ¶ 15.10, notice requesting provisional acceptance of completed works, *id*. ¶ 16.1, notice of noncooperation from third parties, *id*. ¶ 18.1, notice of defects covered by warranty, *id*. ¶ 19.2, notice of a chance in representative, *id*. ¶ 21.2, notice of intent to seek indemnity, *id*. ¶ 25.3, notice of an act of God or force majeure that inhibits performance, *id*. ¶ 27.1, notice of reasons to cancel the contract, *id*. ¶ 28.2, notice of the contractor's breach, *id*. ¶ 28.3, notice of a performance guarantee, *id*. ¶ 29.1, notice of a chance in laws relevant to an indemnity, *id*. ¶ 30.3, notice of a chance in the works, *id*. ¶ 30.8, notice of a request to adjust the size of semiannual payments, *id*. ¶ 30.9(b), notice of the owner's breach, *id*. ¶ 32.2, and notice of contractor's cancellation of the contract, *id*. ¶ 32.3.

agreements: the Hague Service Convention, and the Inter-American Convention on Letters Rogatory. Neither convention permits service by mail or courier to parties in Mexico.

The Hague Service Convention provides that as a general matter, service on parties in a foreign nation must be accomplished via a central authority in that nation, a process that Conproca has not attempted. *See* Hague Service Convention art. 2-6. In the alternative, the Hague Convention and the Inter-American Convention on Letters Rogatory and its Additional Protocol permit service by letter rogatory, which is a request formally submitted through judicial or diplomatic channels. *See* Hague Service Convention art. 5(a); Inter-American Convention on Letters Rogatory, art. 4-5, Additional Protocol art. 3-4.

Conproca's affidavits for service state that it attempted service "by UPS mail," an invalid channel under either convention.[4] Consequently, it has not fulfilled the requirements of the FSIA, and this Court is without personal jurisdiction to confirm the arbitral award in this case.

Pemex understands that Conproca has initiated the letter rogatory process. After the parties agreed on a briefing schedule in this case, Pemex received documents in connection with a rogatory request. Pemex is presently reviewing these materials. Under the FSIA, Pemex has sixty days from the date of service, *i.e.*, until August 27, 2012, to respond to the rogatory service.

---

[4] Article 10 of the Hague Service Convention permits service by mail, provided the country in which service is attempted has not objected to that method. However, service by mail is not permitted in Mexico, which has expressly stated "that it is opposed to the use in its territory of the methods of transmission provided for in Article 10." *See* Hague Conference on Private International Law, Declarations, ¶ 2, http://www.hcch.net/index_en.php?act=status.comment &csid=412&disp=resdn (last visited July 12, 2012). Courts have held that service by mail or courier is inappropriate in Mexico. *See OGM, Inc. v. Televisa, S.A. de C.V.*, 2009 WL 1025971, at *3 (C.D. Cal. 2009) ("Mexico has in fact objected to service through the alternative methods specified in Article 10 of the Hague Convention, and . . . service through Mexico's Central Authority is the exclusive method by which Plaintiff can serve Televisa in Mexico."); *see also Barnett v. Miguel*, 2011 WL 473855, at *1-2 (D. Idaho 2011) (same).

*See* 28 U.S.C. § 1608(d). Pemex will submit any objections to the rogatory service by that deadline.

## II.     There Is No Constitutional Personal Jurisdiction.

In addition to statutory personal jurisdiction requirements, a plaintiff must show that jurisdiction is appropriate as a matter of due process. Conproca cannot carry that burden.

### A.  The Due Process Clause Protects Pemex.

Pemex, as a foreign corporation, is entitled to the protections of the due process clause. While foreign states themselves may not avail themselves of due process protections, in the Second Circuit, the due process clause protects the *instrumentalities* of a foreign state unless the foreign government "so 'extensively controls' the instrumentality 'that a relationship of principal and agent is created,' or if 'adhering blindly to the corporate form . . . would cause . . . injustice.'" *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009) (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626-27, 629, 632 (1983)) (alteration marks omitted). In conducting this inquiry, "government instrumentalities are presumed to be distinct from their sovereign and normally are treated as such." *Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000).

This "presumption of separateness is a strong one." *Id*. at 252. To overcome it, Conproca must show that Pemex and the Mexican government are so intertwined that the liabilities of one would be appropriately regarded as the liabilities of the other. This standard was first articulated by the Supreme Court in *Bancec*. In that case, a bank controlled by the Cuban government had sought a letter of credit from Citibank to support a contract for the export of Cuban sugar to the United States. 462 U.S. at 613. While the payment was pending, the Cuban government nationalized all of Citibank's Cuban assets. *Id*. Bancec then sued Citibank for collection on the

letter of credit, and Citibank sought an offset in the amount of its expropriated property. *Id*.

While the litigation was pending, Bancec was dissolved and fully incorporated into the Cuban

government. *Id*. Nevertheless, the Cuban government continued to assert that Citibank was not

entitled to an offset because Bancec had been a separate entity. The Court recognized the

injustice that would result if the Cuban government was allowed to pursue collection on

Bancec's letter of credit, but Citibank was denied a valid counterclaim. *Id*. at 631-32. The Court

reasoned that:

> Giving effect to Bancec's separate juridical status in these circumstances, even
> though it has long been dissolved, would permit the real beneficiary of such an
> action, the Government of the Republic of Cuba, to obtain relief in our courts that
> it could not obtain in its own right without waiving its sovereign immunity and
> answering for the seizure of Citibank's assets-a seizure previously held by the
> Court of Appeals to have violated international law. We decline to adhere blindly
> to the corporate form where doing so would cause such an injustice.

*Id*. at 632 (footnote omitted). The Court explained that its decision did not create any

"mechanical formula for determining the circumstances under which the normally separate

juridical status of a government instrumentality is to be disregarded." *Id*. at 633. Rather, it

explained that the point was "to avoid the injustice that would result from permitting a foreign

state to reap the benefits of our courts while avoiding the obligations of international law." *Id*.

Applying *Bancec*, the both this Court and the Second Circuit have consistently refused to

merge instrumentalities with foreign states. In *De Letelier v. Republic of Chile*, 748 F.2d 790,

794-95 (2d Cir. 1984), the court reasoned that because there was no evidence that the Chilean

state airline, LAN, was "established to shield its owners from liability for their torts or that Chile

ignored ordinary corporate formalities" in its relationship with LAN, the presumption of

independence was not overcome. And in *LNC Investments, Inc. v. Republic of Nicaragua*, 115 F.

Supp. 2d 358, 366 (S.D.N.Y. 2000), *aff'd sub nom LNC Invs., Inc. v. Banco Central de*

*Nicaragua*, 228 F.3d 423 (2d Cir.2000), this Court held that the central bank of Nicaragua was

11

not the "alter ego" of the Nicaraguan government. The court reasoned that the bank "engages in both governmental and private banking activities," and that its enabling statute did not provide the government with "control over the day to day operations of the Central Bank or the monetary policies it adopts." *Id*. at 364. The court recognized that the government appointed the bank's directors and officers, but noted that they were employees of the bank, and not of the government. *Id*. It also noted the significant independent powers of the bank, including its ability to "own and sell property in its own name, and sue and be sued in a court of law in its own name." *Id*. Other courts agree with this conclusion. *See, e.g.*, *First Inv. Corp v. Fujian Maiwei Shipbuilding, Ltd.*, 2012 WL 831536, at *11 (E.D. La. 2012) (holding that "majority shareholding and the ability to appoint the board of directors cannot, without more, overcome the presumption of separateness," and that even when a company's directors were formerly government officers, that fact "does not show that those officials were acting to serve the interests of the sovereign in controlling the day-to-day operations of the entities").

This Court should not disturb the presumption of independence in this case. While the Mexican government does have general supervisory authority over Pemex, it does not control Pemex's day to day operations, and recognizing Pemex's independence would not result in an injustice. Pemex's enabling statute provides for the appointment of an independent board of directors comprising six state officials, five union officials, and four professional directors with industry expertise. That board, together with Pemex's officers, who are Pemex employees, manages the company's day to day operations. Pemex owns property, and can sue and be sued in its own name. Moreover, it is taxed and regulated by the Mexican government, a fact that establishes the institutional separation between the two. The burden is on Conproca to show otherwise, and it has not done so.

**B.  This Court Lacks Personal Jurisdiction Over Pemex as a Matter of Due Process.**

The due process clause authorizes personal jurisdiction only when a defendant has "minimum contacts" with the forum, and when the exercise of jurisdiction is "reasonable" in light of those contacts. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). When, as here, the plaintiff seeks to assert "general jurisdiction," *i.e.*, jurisdiction "based on the defendant's general business contacts with the forum state," the court must "impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'" *Id.* at 568 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984)). The reasonableness inquiry seeks to determine whether the exercise of jurisdiction "comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe*, 326 U.S. at 316). Courts examine five factors to determine "reasonableness"

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* These two factors are related.

Conproca has not identified any "continuous and systematic" business contacts between Pemex and the United States. While one of Pemex's subsidiaries (P.M.I. Comercio Internacional, not involved in this case) exports oil to the United States, and while Pemex occasionally issues debt securities to the U.S. market, those facts alone are insufficient for general jurisdiction. *See Kiobel v. Royal Dutch Petroleum Co.*, 2010 WL 2507025, at *9 (S.D.N.Y. 2010) (holding that petroleum exports through an unrelated subsidiary did not give rise to sufficient contacts for personal jurisdiction).

13

Aside from the lack of continuous and systematic contacts, the exercise of jurisdiction would not be reasonable in any event. Both Pemex and Conproca are foreign entities with no meaningful ties to the forum state. The relevant contracts are drafted in Spanish and governed by Mexican law. The contracts were executed, performed, and allegedly breached in Mexico. And the arbitration was likewise conducted in Mexico, and Mexican law governs the validity of the arbitration award. *See* Matthew D. Slater, *On Annulled Arbitral Awards and the Death of* Chromalloy, 25 Arbitration Int'l 271, 284 (2009) (explaining that when parties "decide to conduct an arbitration with its legal seat in a particular jurisdiction, they are necessarily committing to subject the process and themselves to the arbitral laws of that jurisdiction"). Litigating these issues here would thus impose a significant burden on Pemex, would serve no interest of the forum state, and would be significantly less efficient than litigating these issues in Mexico, where the courts have the familiarity and expertise to assess the award's validity under Mexican law.

Because Conproca has not met, and cannot meet, its burden to prove personal jurisdiction as either a statutory or a constitutional matter, the petition should be dismissed.

**III. The Petition Should Be Dismissed on *Forum Non Conveniens* Grounds.**

The doctrine of *forum non conveniens* also supports dismissal because Mexico is a far superior forum in which to litigate the validity of the award. The court may dismiss the petition on *forum non conveniens* grounds if there is a viable alternative forum that "will be most convenient and will best serve the ends of justice." *Alfadda v. Fenn*, 159 F.3d 41, 46 (2d Cir. 1998) (internal quotation marks omitted). The test for *forum non*

14

*conveniens* requires the court to consider the plaintiff's choice of forum, the adequacy of alternative forums, and the public and private factors in favor of each forum. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc). The doctrine applies with equal force to petitions to confirm arbitration awards. *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 390 (2d Cir. 2011) (dismissing petition on *forum non conveniens* grounds when enforcement of the award would frustrate Peruvian policy choice limiting recovery against state entities). Where, as here, the parties are Mexican entities (one a state entity), arguing about a contract that was drafted in Spanish, and then executed, performed, and allegedly breached in Mexico, and then addressed in a Mexican arbitration proceeding, the *forum non conveniens* factors weigh heavily against exercising jurisdiction, and instead allowing the Mexican courts to first resolve the validity of the award.

The first factor is whether the plaintiff's choice of forum merits deference. The Second Circuit has held that "[a] domestic petitioner's choice of its home forum receives great deference, while a foreign petitioner's choice of a United States forum receives less deference." *In re Arbitration between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 498 (2d Cir. 2002). Thus, in *Monegasque*, the Second Circuit held that when a foreign petitioner sought confirmation of a foreign arbitral award in New York, that choice was entitled "little deference." *Id*. at 499. The same is true here—Conproca's decision to seek confirmation here instead of Mexico constitutes blatant forum shopping, and should receive no deference.

The second prong of the inquiry is whether an adequate alternative forum exists. Here, that forum would be Mexico. "An alternate forum is adequate if the defendants are

amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Figueiredo*, 665 F.3d at 391 (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003)). U.S. courts routinely deem Mexico an adequate forum. *See, e.g.*, *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796-98 (5th Cir. 2007); *Gonzales v. Chrysler Corp.*, 301 F.3d 377, 381-83 (5th Cir. 2002). U.S. courts also respect the judgments of Mexican courts under principles of comity and *res judicata*, and enforce valid Mexican judgments. *See, e.g.*, *Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.*, 108 F. Supp. 2d 349, 352 (S.D.N.Y. 2000), *aff'd sub nom. Ecoban Fin. Ltd. v. Altos Hornos de Mexico, S.A. de C.V.*, 2 F. App'x 80 (2d Cir. 2001); *Southwest Livestock & Trucking Co., Inc. v. Ramon*, 169 F.3d 317, 323 (5th Cir. 1999).

Mexico is also an adequate forum with regard to arbitration proceedings in particular. Nearly two decades ago, Mexico enacted legislation "to modernize and update the legal framework of commercial arbitration through the embodiment of the most advanced norms on the subject, thus achieving harmonization of the arbitral procedural rules oriented to the specific needs of dispute resolution in international commercial practice." Jose Luis Siqueiros, *International Commercial Arbitration*, in 2 Mexican Law: A Treatise for Legal Practitioners and International Investors § 16.3, at 5 (1998) ("*Mexican Law: A Treatise*"). Legislative changes relating to "international arbitration issues" are "perhaps the most detailed, modern and pragmatic in Mexican legal history and very much in step with parallel trends at the international level." Jorge A. Vargas, *Enforcement of Judgements and Arbitral Awards*, in 2 *Mexican Law: A Treatise* § 23.1, at 276. Indeed, "Mexico's efforts to harmonize its laws with international legal principles

has recently been ratified by its highest court, the Supreme Court of Justice, . . . . further ensur[ing] the application of international law principles and treaties and the enforcement of foreign arbitration awards in Mexican courts." Geoffrey H. Bracken & Peter Scaff, *Effective & Enforceable Dispute Resolution in U.S./Mexican Commercial Trade*, 45 Houston Lawyer 36, 38 (2007).

The private interest factors—which relate to "the convenience of the litigants"— weigh against jurisdiction. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001). The factors include "'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* at 73-74 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). "Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried . . . ." *Id.* at 74. While some of the private interest factors are not necessarily relevant in an arbitration confirmation proceeding, others weigh heavily against jurisdiction. Both parties are Mexican entities, and neither has a U.S. parent. Furthermore, any confirmation proceeding will necessarily require an examination of the parties' agreement—which was executed and performed in Mexico, drafted in Spanish, and governed by Mexican law. The dispute will also focus on whether the award itself is valid as a matter of Mexican law, and it may involve special rules relating to the availability of damages against state entities. These issues are indisputably best left to Mexican courts.

The public interest factors likewise weigh against jurisdiction. Among the relevant public interests are "a local interest in having localized controversies decided at home, and the interest in having foreign law interpreted by a foreign court." *Figueiredo*, 665 F.3d at 389-90 (internal citation and quotation marks omitted). Thus, aside from the private efficiency concerns that weigh in favor of a Mexican resolution to this controversy, there is also a substantial public interest, rooted in comity and international respect, in favor of allowing Mexican courts to resolve the validity of the award in the first instance.

## IV. Venue in the Southern District of New York Is Improper.

The petition should be dismissed because venue does not lie in the Southern District of New York. As with the other elements of jurisdiction, Conproca "bears the burden of establishing that venue is proper." *D'Anton Jos, S.L. v. The Doll Factory, Inc.*, 937 F.Supp. 320, 321 (S.D.N.Y. 1996). The FSIA's venue provision provides, in relevant part, that in an action against an agency or instrumentality of a foreign state, venue lies "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," or "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." 28 U.S.C. § 1391(f)(1), (3); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 153 (2d Cir. 2001) (holding that "the apposite venue provision is 28 U.S.C. § 1391(f)). It is beyond dispute that no part of the events giving rise to Conproca's claim occurred in New York, and Conproca has not identified any property that is the subject of the underlying action.

Nor can it be said that Pemex does business in New York. A prior version of the venue statute provided that a corporation could be sued "in any judicial district in which it is incorporated or licensed to do business or is doing business." 28 U.S.C. § 1391(c) (1976). Interpreting that identical language, this Court held that "[t]he test for doing business for venue purposes . . . is analogous . . . to the 'doing business' test used to establish jurisdiction under CPLR Section 301." *Sterling Television Presentations, Inc. v. Shintron Co., Inc.*, 454 F. Supp. 183, 190 (S.D.N.Y. 1978); *see also Oral-B Laboratories, Inc. v. Mi-Lor Corp.*, 611 F. Supp. 460, 462 (S.D.N.Y. 1985) (same). To satisfy that standard, it is not enough that the defendant engage in some conduct in New York. Instead, the defendant's conduct must be "continuous, permanent, and substantial." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (internal quotation marks omitted). Some relevant factors include: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985).

Pemex's activities in New York do not meet this standard. Pemex has no offices, employees, or relevant properties here. *See Klonis v. Nat'l Bank of Greece, S.A.*, 492 F.Supp.2d 293, 299-300 (S.D.N.Y. 2007) (holding that a bank, which had no offices in the state, owned no property in the state, had no local phone listing, and did no public relations work in the state was not "doing business" in New York, even though it had an officer there, and the bank's depository receipts traded on the New York Stock Exchange). And the fact that Pemex has raised capital in New York has never been held sufficient to constitute "doing business" in that state. Indeed, courts expressly hold the

opposite in interpreting the analogous New York jurisdiction statute. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Medicine*, 988 F.Supp. 127, 223 (W.D.N.Y. 1997) (holding that issuing bonds using New York firms does not constitute "doing business" in New York); *Nelson v. Mass. Gen. Hosp.*, 2007 WL 2781241, at \*23 (S.D.N.Y. Sept. 20, 2007) (same); *Clarke v. Fonix,* 1999 WL 105031, at \*5 (S.D.N.Y. Mar.1, 1999) (same). Even when the raising of funds was "an essential aspect of the defendant's business," courts have held that the mere raising of capital does not constitute "doing business." *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 565-66 (S.D.N.Y. 1985); *see also Nelson*, 2007 WL 2781241, at \*30 ("Even where commercial financing and investment activities are at the core of an out-of-state defendant's business . . ., courts have been loath to find that retaining the services of New York professionals or accessing New York's unique capital markets constitutes "doing business" in New York.").

Because none of the statutory bases for venue apply, this Court should dismiss the petition.

## CONCLUSION

Conproca's petition to confirm the arbitration award should be dismissed.

Respectfully submitted,

/s/ Thomas C. Goldstein

Thomas C. Goldstein
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave. NW
Suite 404
Washington, DC 20015
Tel.: 202.362.0636
tgoldstein@goldsteinrussell.com

Dated: July 12, 2012